**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **RANDOLPH CLAY COOPER,** | ) | |
| **an Individual,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO.: 1:21-cv-00324-C** |
| | ) | |
| **SHAWN LUCAS LISTER, an Individual;** | ) | |
| **AARON GLASS, an Individual; ZACH** | ) | |
| **KUIKEN, an Individual; and the TOWN** | ) | |
| **OF LOXLEY, ALABAMA,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER[1]

This matter is before the Court on the Motion for Summary Judgment filed by the Defendants Shawn Lucas Lister, Aaron Glass, Zach Kuiken (the "Defendant officers"), and the Town of Loxley, Alabama (Doc. 51). The parties have filed briefs and evidentiary materials in support of their respective positions (Doc. 52, 53, 54, 58, 59, 60, 61, and 64), including bodycam videos which the court has reviewed (Doc. 54, 61). The Court heard oral argument from the parties on November 29, 2022. The motion is ripe for review. After careful consideration of the parties' briefs and arguments, the Court grants the Defendants' motion for summary judgment.

## I.    Nature of Lawsuit

The Plaintiff Randolph Clay Cooper ("Clay") filed this lawsuit on July 22, 2021, seeking damages under 42 U.S.C. § 1983 for alleged violation of his constitutional rights arising out of his arrest by Defendants, Lister, Glass and Kuiken on May 27, 2020 and against the Town of Loxley

---

[1] Upon consent of the parties, this action has been referred to the undersigned to conduct all proceedings, including trial, entry of a final judgment and post-judgment proceedings pursuant to 28 U.S.C. §636(c) and Fed.R.Civ.P. 73. See Docs 22 & 23.

for an alleged deliberate policy or custom of indifference in failing to train and/or supervise its officers (Doc. 2). The last amended complaint, filed on March 22, 2022, contains a first cause of action against the Defendant officers for violation of his Fourth Amended rights arising out of his arrest on May 27, 2020 and a second cause of action against Defendant Kuiken for violation of his Fourth Amendment rights for malicious prosecution leading to a grand jury indictment and his subsequent arrest on May 24, 2021, for theft of hay (Doc. 36). In the second cause of action the Plaintiff has merged this malicious prosecution claim with a claim against the Town of Loxley, alleging that the actions of the Defendant officers resulted from deficiencies in the training and supervision of those officers and from a deliberate policy of indifference by the Town to the need for such training and supervision with the knowledge of on-going civil litigation between Clay and his siblings. (Doc. 36, ¶ 37, PageID.117).

On April 5, 2022, the Defendants answered the Plaintiff's last amended complaint asserting qualified immunity, among other defenses (Doc. 39, PageID.126). Defendants filed a motion for summary judgment on September 16, 2022 (Docs. 51, 52 & 53).

## II. **Findings of Fact**

### A. **Record Ownership of 10.1-Acre Parcel Where Trespass Occurred**

1.      David Bonner ("David") and Rebecca Anne Bonner ("Becky") are the record title owners of a 10.1-acre parcel, located at 19540 County Road 64 in Baldwin County, Alabama. Becky and David acquired this parcel from Becky's mother, Carol Evans Cooper ("Carol"), who conveyed it to them in her capacity as trustee of the Carol Evans Cooper Revocable Living Trust (the "Carol RLT") by quitclaim deed recorded on March 10, 2011, reserving to herself a life estate (Doc. 52-8, PageID.220). The legal description was subsequently corrected by a Scrivener's Affidavit recorded on November 29, 2011. (Doc. 52-9, PageID.222). This 10.1-acre parcel had

been carved out of a larger 110-acre parcel (the "Farm Property"), which had been earlier conveyed to the Carol RLT by Carol, as personal representative of the estate of her husband, Nolan P. Cooper, Jr. ("Nolan, Jr.") (Doc. 52-5, PageID.176-77).

2.  As shown in the record, and as confirmed by counsel at the hearing on the motion for summary judgment, it is undisputed that this 10.1-acre parcel was the property on which Clay was operating a tractor and on which he was arrested for trespass by the Defendant officers on May 27, 2020.  (Deposition of Clay Cooper at 23:2-17) (Doc. 60-9, PageID.1031).    It is also undisputed that this was the property from which Clay took certain hay bales, leading to his indictment and subsequent arrest on May 24, 2021, for theft of hay.

3.    The 10.1-acre parcel deeded to Becky and David included a residence where Carol and her husband, Nolan, Jr., had lived and raised their three children, Becky, Clay, and Garland Terrance Cooper ("Terry") (Deposition of Rebecca Bonner at 52:16-22) (Doc. 52-10, PageID.235).  At the time of the conveyance in 2011, Carol was still living on the 10.1-acre parcel. Because she was sick, David and Becky had moved in to take care of her.  (Rebecca Bonner at 49:19-21) (Doc. 52-10, PageID.232).

**B.  Clay's 2012 and 2015 Litigation Challenging Title**

4.    Following his mother's death in April of 2012, Clay began filing lawsuits in state court against his siblings, Becky and Terry, claiming that certain assets of Nolan, Jr.'s estate, including the 10.1-acre parcel, should have been placed in a unified credit trust created in his father's will (hereinafter the "Nolan UCT").  Carol was the trustee and sole beneficiary of the Nolan UCT during her lifetime and upon her death any remaining trust assets were distributable in equal shares to Nolan Jr.'s children, Becky, Clay and Terry (Doc. 52-4, PageID.167-68).    Clay complained that these assets, instead of being placed in the Nolan UCT, were conveyed by his

mother Carol, as personal representative of Nolan, Jr.'s estate, to herself or to the Carol RLT, under which the trust assets were distributable to Becky and Terry, but not to him.  See Carol RLT, Art. I (Doc. 52-6, PageID.196).

5.      Clay's 2012 and 2015 lawsuits are described in the November 16, 2018, decision of the Alabama Supreme Court in *Cooper v. Cooper*, 279 So. 3d 561 (Ala. 2018), *reh'g denied* (Ala. Jan. 4, 2019).  (Doc. 52-11, PageID.247-252).  In 2012, following his mother's death in April of 2012, Clay sued Becky, Terry, David, and Diane Porter, an attorney and accountant, alleging that, at Becky's direction, his mother Carol reopened Nolan, Jr.'s estate in 2008 and wrongfully transferred property, including property that should have been in the Nolan UCT, to herself or to the Carol RLT.  *Id.* at 563, PageID.248.  Clay sought a full accounting of all assets "held by [Mr. Cooper's] trust or rightfully belonging to [that trust], including those which already have been dissipated, transferred or sold."      *Id.,* PageID.248-249 (brackets in original). He also sought a judgment "requiring that one-third of the assets which should have funded [Mr. Cooper's trust], but which were instead diverted to the Carol Cooper Revocable Trust(s), and thereafter to Becky and [Becky's husband], be distributed to [Clay] (and likewise to Terry)." *Id.,* PageID.249 (brackets and parenthetical in original). Finally, he sought a judgment "ordering the partition and sale, or alternatively the equitable distribution of [Mr. Cooper's trust] assets, in accordance with the Nolan Cooper will and [Mr. Cooper's trust]." *Id.*    (brackets in original). The circuit court entered a summary judgment without opinion in favor of the defendants, and on appeal, the judgment was unanimously affirmed by the Alabama Court of Civil Appeals without opinion on September 12, 2014. *Id.* (citing *Cooper v. Bonner*, 190 So. 3d 60 (Ala. Civ. App. 2014) (table)).

6.      The opinion in *Cooper v. Cooper* further describes the 2015 litigation, commenced by Clay in March of 2015, after losing the 2012 lawsuit, in which he sought a termination of the

Nolan UCT and distribution of the corpus of that trust, "including the appreciated value of any assets which this court determines should have been included as assets of the testamentary trust," to Clay, Terry and Becky, the beneficiaries of that trust, and also sought a complete accounting of that trust since the day it was funded.  *Id.*   The trial court granted summary judgment to Becky and Terry. *Id.* at 565, PageID.250.  On Clay's appeal, the Supreme Court affirmed based on res judicata.  It held that the 2015 lawsuit sought the same relief that had been sought in the 2012 lawsuit and involved the same parties, and that both arose out of the same nucleus of operative facts.  *Id.* at 567, PageID.251-52.

      **C.**     **Arrest of Clay in 2019 by County Sheriff for 2017 Trespass on 10.1 Acre Parcel**

     7.     On May 10, 2015, while the 2015 litigation was pending, a fire broke out in the residence where Becky and David Bonner were living on the 10.1-acre parcel.  (Rebecca Bonner at 42:12-19) (Doc. 52-10, PageID.226).  Five days later, tires were slashed on a truck and trailer in their barn (*Id.* at 42:21-22).  In August, numerous tires were slashed on vehicles in their carport and yard and on Terry's mother-in-law's car, and screens were slashed on Terry's back porch (*Id.* at 43:1-2, 44:3-14) (Doc. 52-10, PageID.227-228).  Because neither Becky nor Terry had any enemies who would do such a thing, Becky was suspicious and believed Clay was responsible for the vandalism (*Id.* at 45:9-12; 46:10-13) (Doc. 52-10, PageID. 228-229).  Because of the fear these acts of vandalism generated, Becky and David moved off the 10.1 acres (*Id.* at 48:11-14) (Doc. 52-10, PageID.231).  They put deer cameras up on the property because they were frightened someone was after them.  The only person they could imagine who might have a vendetta against them was Clay.  He had threatened and harassed their mother to the point she had to get a restraining order (*Id.* at 54:9-15) (Doc. 52-10, PageID.236).

     8.     Clay was thereafter caught on the camera driving through the 10.1-acre parcel on

February 15, 2017. Eight days later, Becky swore out a warrant for his arrest for criminal trespass with the Baldwin County Sheriff's Department. Clay was arrested on the warrant on September 15, 2019 (Rebecca Bonner at 50:7-52:15; Pltf's Ex. 1) (Doc. 52-10, PageID.233, 241-243). Becky was never notified of the trial date. (*Id.* at 62:13- 63:9) (Doc. 52-10, PageID.238-239). As a result, the case was *nolle prossed* by the district attorney on October 24, 2019, when the prosecuting witness failed to appear (*Id.* at 61:7-62:5; Pltf's Ex. 3) (Doc. 52-10, PageID.237-238).

9.  On December 23, 2019, Clay drove onto the 10.1-acre parcel and gave David a copy of the October 24 *nolle prosse* order, telling him that he could not keep him off the property, that he was going to farm the property and do what he wished with it, and that he would sue Becky for malicious prosecution. (Deposition of David Bonner at 12:2-13:3) (Doc. 52-12, PageID.256-257). David told Clay that he had put a lock on the gate to keep people off the property and that he would not allow Clay to stay on the 10.1 acres (*Id.* at 12:9-13, 13:5-6).

**D.  Officer Kuiken's Investigation of Theft of Hay Bales and Ownership of Property**

10.  A few weeks before the September 15 arrest, on August 23, 2019, Loxley Police Officer Kyle Hattemar had met with Terry Cooper and Marvin Hayes regarding a theft of hay bales from the 10.1-acre parcel (Deposition of Zachary Kuiken at 15:15-16:5; Pltf's Ex. 3 to Deposition of Shawn Lister) (Doc. 52-13, PageID.264-265, 313-321). Terry advised Hattemar that he and his sister Becky were the legal owners and caretakers of a large parcel of property on County Road 64, that Clay Cooper had been litigating for rights in the property, and that the case had proceeded to the Alabama Supreme Court which had awarded the case to Becky and Terry (Pltf's Ex. 3 at Loxley 0093-0095) (Doc. 52-13, PageID.314, 316). Terry reported an "extensive history of tampering with the property" and "apparent attempts at intimidation perpetrated" by Clay against his siblings due to bitter feelings (*Id.,* Pltf's Ex. 3 at Loxley 0095). Terry reported that Hayes had

been "given permission by [Becky] to cut hay from the property at his own expense and to then utilize or sell the hay as appropriate."  Hayes advised "that he had cut the hay over the first week of this month and then bailed [sic] it.  When [he] returned on August 5 to collect the hay, he found all 25 bales missing from the field."  He then "located the bales of hay at [Clay's] residence on Bull Springs Road in Robertsdale."  Hayes reported "he had spoken to [Clay] at that time and that [Clay] had confirmed he had taken the hay" and that Clay "seemed assured he had a legal right to the hay as it belonged to [Becky] on disputed property . . . despite the fact that the hay had been cut and baled at Hayes' expense" (*Id*., Pltf's Ex. 3 at Loxley 0095).  Hayes and Terry Cooper gave written statements confirming this conversation with Officer Hattemar (Pltf's Ex. 3 at Loxley 0102-0104) (Doc. 52-13, PageID.319-321).

11.    At the request of Lieutenant Raymond Lovell, Defendant Zach Kuiken took over the investigation of the theft complaint from Kyle Hattemar (Kuiken at 15:11-14; 16:6-8) (Doc. 52-13, PageID.264-65).  Kuiken spoke to Hayes, who gave him the value of the hay reportedly stolen by Clay.  (*Id*. at 97:22-98:1) (Doc. 52-13, PageID.289-290).  Kuiken began investigating who the owners of the property were (*Id*. at 17:11-15) (Doc. 52-13, PageID.266).  He interviewed the Bonners, who provided statements that they owned the property and a copy of their deed to the 10.1-acre parcel.  (*Id*. at 20:5-6, 40:16-20; 87:3-5) (Doc. 52-13, PageID.269, 277, 288).  He was also given a copy of Nolan, Jr.'s will and Carol Cooper's will. (*Id.* at 20:14-6; 21:16-23; 45:8-10; Pltf's Ex. 2) (Doc. 52-13, PageID.269, 270, 278, 304-312).  In September of 2019, Becky emailed to Kuiken a copy of the quitclaim deed of the 10.1-acre parcel to the Bonners, the prior deed in the chain of title from Carol Cooper, as personal representative of her husband's estate, to the Carol RLT, and a copy of the Carol RLT (Ex. 1 to Declaration of Thomas O. Gaillard, III at Loxley 0382, 0384-0386, 0389-0394) (Doc. 64-2, PageID.1574-1577, 1580-1583).  She also emailed him

a copy of the November 2018 decision of the Alabama Supreme Court in *Cooper v. Cooper.* (Rebecca Bonner at 25:5-23; Pltf's Ex. 1 at Loxley 0147) (Doc. 52-13, PageID.271, 299).

12. Kuiken personally reviewed the Alabama Supreme Court decision (Kuiken at 26:1-22) (Doc. 52-13, PageID.272). He reviewed the Court's affirmance of the circuit court's judgment in favor of the Bonners in the 2015 lawsuit and understood that ruling as determining the Bonners' ownership of the property (*Id*. at 26:23-27:5; 30:7-10) (Doc. 52-13, PageID.272, 274). He tried to get an interview with Clay and get documentation from him but after multiple attempts was unable to reach him by phone (*Id*. at 18:22-19:8; 40:4-21; 68:23-69:1; 87:5-9) (Doc. 52-13, PageID.267, 277, 284, 288)

13. On September 13, 2019, Clay executed and recorded a deed from himself to himself and his siblings, Terry and Becky, purportedly conveying various parcels of property that had been conveyed to the Carol RLT by his mother, as personal representative of his father's estate, including the 110-acre Farm Property from which the 10.1-acre parcel had been conveyed by the Carol RLT to Becky and David in 2011 (Doc. 52-15) (hereinafter the "Commemorative Deed). Clay subtitled this deed "Commemoration of Devolution of Title to the Heirs and Beneficiaries of Nolan B. Cooper, Jr. and Carol Evans Cooper." After the Bonners advised Officer Kuiken of Clay's filing of the Commemorative Deed, he contacted probate court and obtained a copy of it (Kuiken at 38:15-39:13) (Doc. 52-13, PageID.275-276).

14. On September 20, 2019, Clay sent a letter to the Loxley Police Department, in response to Lt. Lovell's request that his wife, Lisa Cooper, have Clay contact either Lovell or Kuiken concerning an investigation of the theft of hay bales. The letter enclosed a copy of an "order to stay off property" prepared by Clay which Clay said he mailed to Hayes, informing Hayes that he was no longer allowed on the property and would be subject to arrest and prosecution

for trespass if he was found on the property (Deposition of Clay Cooper at 149-150; Pltf's Ex. 1) (Doc. 52-16, PageID.439-440, 442-444). In the letter, Clay did not deny he had taken the hay.

15.     In October of 2019, Becky, Dave and Terry filed a quiet title/slander of title action against Clay in Baldwin County Circuit Court, Case No. 2019-901445, seeking to quiet title to the property described in the Commemorative Deed.

16.     On April 27, 2020, Dan Blackburn, the attorney for Becky, Terry and David in the 2019 quiet title action, sent a letter to Police Chief Cason in response to a request from Kuiken and Lovell for information about the action (Deposition of Daniel Blackburn at 17:5-18:10, 66:9-69:8; Pltf's Ex. 2; Deft's Ex. 1) (Doc. 52-14, Page ID.358-359, 362-363, 367-381, 382-414) This letter was received by the Loxley Police Department and put into the case file (Deposition of John Cason at 55:13-16) (Doc. 52-17, PageID.451). The letter attached a copy of the first amended complaint in the quiet title action, which alleged claims against Clay for slander of title arising out of Clay's filing of the Commemorative Deed in September of 2019, for an order declaring that deed void, and for a declaratory judgment as to the ownership of the parcels Clay had purported to convey by that deed. It also summarized the result of the 2012 and 2015 lawsuits and identified the various conveyances of property transferred by Carol to the Nolan UCT and to the Carol RLT (Deft's Ex. 1 to Blackburn Depo. at Loxley 0059-0060) (Doc. 52-14, PageID.386-387). And attached as exhibits to the amended complaint were copies of the various deeds of conveyance. (Def. Ex. 1 at Loxley 0068-0086) (Doc. 52-14, PageID.395-413), including the 2011 quitclaim deed of the 10.1-acre parcel from the Carol RLT to David and Becky Bonner. (Def. Ex. 1 at Loxley 0074) (Doc. 52-14, PageID.401)[2]. In this letter, Blackburn stated that his clients contended that the

---

[2] Plaintiff's Ex. 2 to Blackburn's deposition is a copy of the letter, attaching a copy of the First Amended Complaint in the 2019 litigation, and an *incomplete* copy of the exhibits to that

Commemorative Deed filed by Clay was "void and of no effect," as claimed in the attached First Amended Complaint, and that Clay "does not have permission to be on the property located at 19540 County Road 64," among other parcels identified in the enclosed First Amended Complaint. (Deft's Ex. 1 at Loxley 0055) (Doc. 52-14, PageID.382).

17.    Kuiken reviewed Blackburn's letter and its attachments before Clay's arrest on May 27, 2020 (Kuiken at 62:18-63:9; 64:11-65:8; Pltf's Ex. 9 to Lister Depo.) (Doc. 52-13, PageID.280, 282-283, 322-354).  Kuiken interpreted all this information to mean that the litigation of property between Becky and Clay had concluded with a ruling in favor of Becky and made a notation to this effect on May 5, 2020, on the Incident Report relating to the hay theft.  (*Id*. at 104:15-20; Pltf's Ex. 3 to Lister Depo. at Loxley 0095) (Doc. 52-13, PageID.291, 316).  It was his understanding that the courts had ruled in favor of the Bonners multiple times (Id. at 111:2-4) (Doc. 52-13, PageID.292).  Kuiken had reason to believe the Bonners had ownership of the property, that Clay was disputing it, but that this dispute did not nullify ownership of the property by the Bonners at the time (*Id*. at 68:6-10; 70:16-23; 71:8-12) (Doc. 52-13, PageID.284, 286, 287).  Based on this information, he had reasonable means to determine that the Bonners owned the property (*Id*. at 87:9-11) (Doc. 52-14, PageID.288).  He did not interpret Clay to be an owner of the property (*Id*. at 50:19-21) (Doc. 52-13, PageID.279).

**E.    Arrest of May 27, 2020**

18.    On May 27, 2020, David Bonner saw Clay's truck and trailer parked on the 10.1-acre parcel and discovered Clay out on the 10.1-acre parcel, raking hay on a tractor (David Bonner at 19:2-6). (Doc. 52-12, PageID.258).  He called the Loxley Police Department and informed them

---

Complaint (Doc. 52-14, PageID.367-381).  Defendant's Ex. 1 is another copy of the letter which includes the First Amended Complaint and *all* exhibits to it.  (Doc. 52-14, PageID.382-414)

that Clay was trespassing on his property and that he wanted him removed (*Id*. at 19:8-11). Defendants Kuiken, Glass and Lister independently responded to the call, arriving in that order (Deposition of Shawn Lister at 67:4-68:2; 69:16-70:4; Pltf's Ex. 13) (Doc. 52-18, PageID.467-468, 469-470, 478-490).  On his way there, Lister spoke to Lt. Lovell in the investigation division, who advised Lister that Cooper had no right to be on the property and that he was trespassing (*Id*. at 17:13-19) (Doc. 52-18, PageID.466).  Upon arrival, the officers asked David Bonner what he wanted them to do; he said he wanted Clay to leave the property (David Bonner at 20:4-7) (Doc. 52-12, PageID.259).

19.    Officer Lister's bodycam video of the confrontation with Clay was identified and marked as Exhibit 14 to Lister's deposition (Lister at 76:1-77:3) (Doc. 52-18, PageID.471-472). It has been filed in the record (Doc. 52-29) and reviewed by the Court.  On the video, Clay is seen plowing a field with a tractor, then bringing it to a stop as he sees Officers Lister and Kuiken at the fence line.  Officer Lister tells Clay to "come here."  Clay refuses and asks them what they want.  Lister replies that Clay had been told to leave the property.  Clay responds that this is his property and that the officers were trespassing and that if they want to arrest him to get the Baldwin County Sheriff to do so.[3]    They ask him to get off the tractor.  He refuses, backs up his tractor, and continues to drive it on the property.  Lister warns Clay again to get off the tractor and to listen to his commands.  Lister and Kuiken then cross the fence line, approach Clay and tell him to "come here."  Clay does not comply with the direction to "come here" but drives away from the officers on the tractor.  After pursuing him on foot, the officers discover him coming around a building, still on the tractor, where Sgt. Glass also appears on the video.  All three begin commanding him

---

[3] Officer Lister confirmed that he heard Clay say this (Lister at 87:1-3) (Doc. 64-5, PageID.1599).

repeatedly to get off the tractor, drawing their weapons as he continues to sit on the tractor. They repeatedly tell him to get off or he would be tased. He finally gets off and lays on the ground on his stomach, and they handcuff his hands behind him. Sergeant Glass places his knee on Clay's shoulder for a few seconds to restrain him while the handcuffs are secured.

20.     Clay would not comply with Lister's commands until he saw the force level the officers displayed (Lister at 95: 19-22) (Doc. 52-18, PageID.473). In refusing to speak with them and driving his tractor off, Clay had failed to obey a lawful order from a lawful contact (*Id*. at 95: 23-96:4). When Lister tried to obtain Clay's left hand to put it in handcuffs, Clay pulled it away as Lister told Clay to stop resisting. That is when Sergeant Glass knelt and secured Clay's shoulders so that Clay could not pull his hand away (*Id*. at 99: 3-8) (Doc. 52-18, PageID.475). They had not cleared his waistband for any weapon, so his hands had to be secured to avoid potential harm to anyone from such a weapon (*Id*. at 99: 9-13).

21.     Cooper was charged with criminal trespass in the second degree in violation of Ala. Code § 13A-7-3 and with attempting to elude law enforcement in violation of Ala. Code § 13A-10-52 (Cason at 19; Pltf's Ex. 3 at Loxley 0020, 0024) (Doc. 52-17, PageID.450, 460, 462). Clay filed a motion to dismiss the criminal proceedings on the grounds that the municipal court lacked subject matter jurisdiction. He argued that, although the Town of Loxley had annexed land that would have extended its police jurisdiction to include the 10.1-acre parcel, the Town had not formally done so by an affirmative vote of its governing body as required under Ala. Code § 11-40-10(2) (*Id*. at 16:16-17:8; Pltf's Ex. 2) (Doc. 52-17, PageID.448-449, 453-456). The prosecutor for the Town thereafter moved to *nolle prosse* the two criminal cases and an order was so entered on September 3, 2020 (*Id*. at 19:11-20; Pltf's Ex. 3 at Loxley 0031, 0030) (Doc. 52-17, PageID.450, 457-458).

F.     **Grand Jury Indictment for Theft of Hay; Dismissal of Criminal Charges Upon Payment of Restitution.**

22.     Upon completion of the Loxley Police Department's investigation, the theft of hay complaint was forwarded by Officer Kuiken to the county DA's office for presentation to the grand jury (Deposition of Raymond Lovell at 35:5-12 (Doc. 52-19, PageID.494).   Kuiken's recollection is that he told the DA the parties were actively involved in a civil case regarding title to the property (Kuiken. at 59:6-13; 98:2-8) (Doc. 52-13, PageID.290, Doc. 60-26, PageID.1342).   He also testified at the grand jury proceedings and believes that he informed that body that the parties were involved in pending civil litigation to determine title to the property (*Id*. at 60:1-5) (Doc. 60-26, PageID.1343) and that Clay had made statements that it was his property (*Id*. at 61:19-20) (Doc. 60-26, PageID.1344).   He brought all his case file with him (60:14-19).   Sgt. Lovell had put together all the documents they had to present to the grand jury, which included the Incident/Offense Report related to their investigation of the hay theft, marked as Exhibit 13 to Lister's Deposition (Lovell at 35:19-36:13) (Doc. 60-27, PageID.1383-84; Doc. 52-18, PageID.478-489).

23.     In September of 2020, the grand jury returned an indictment for theft of property in violation of Ala. Code § 13A-8-4.1 (Doc. 52-31, PageID.634) (Clay Cooper Depo at 91:6-16) (Doc. 52-16, PageID.431).   Clay was subsequently arrested by the Baldwin County Sheriff's Office on May 24, 2021 (Clay Cooper at 82, 92-93) (Doc. 52-16, PageID.430, 432-433).   On November 1, 2021, the Circuit Court of Baldwin County granted a motion filed by the DA to *nolle prosse* the criminal proceedings upon Clay's payment of restitution (Doc. 52-31, PageID.635).

G.     **December 7, 2021, Summary Judgment on Clay's Counterclaims in 2019 Litigation Seeking Declaration of Ownership Interest in Properties Conveyed to the Carol RLT**

24.     In the 2019 quiet title action filed by Becky, David, and Terry against Clay, Clay

filed a counterclaim.  His third amended counterclaim included claims for declaratory judgment and to remove an alleged cloud on title.  (Doc. 52-21, PageID.502-537).  In his first cause of action for declaratory judgment, Clay had asked the court to declare that he owned an interest in the parcels of property described in a *lis pendens* that he filed, which included Farm Property conveyed by Carol to the Carol RLT and the 10.1-acre parcel conveyed by the Carol RLT to Becky and David.  *See* Third Amended Counterclaim, ¶15 and Ex. 3 thereto (Doc. 52-21, PageID.515-516, 539).  He claimed that he and his siblings, Becky and Terry, had equal shares in the ownership of these properties, because title had devolved to the Nolan UCT upon Nolan, Jr.'s death. (*Id*.)  He also sought a declaration that the various administrator deeds executed by Carol, as executrix of Nolan, Jr.'s estate, were void (Doc. 52-21, PageID.516) and that the Carol RLT was not a valid trust or, alternatively, that he, Becky and Terry were all equal beneficiaries of the Carol RLT (Doc. 52-21, PageID.521-522).  In his second cause of action to remove a cloud on title, he again sought an order seeking to invalidate the various administrator's deeds executed by Carol as void, as well as the quitclaim deed to Becky and David (Doc. 52-21, PageID.525-526).  And he sought an order further declaring that the ownership of each parcel of real property described in the five administrator deeds and the quitclaim deed were owned as alleged in paragraphs 15 and 16 of his third amended counterclaim, giving himself an interest (*Id*.).

25.     Becky, David and Terry moved for summary judgment on Clay's first and second causes of action in this Third Amended Counterclaim as barred by the doctrines of res judicata and claim preclusion and that his other tort claims of outrage, wantonness and conspiracy failed as a matter of law (Doc. 52-22, PageID.545-577).  On December 7, 2021, the court entered an order granting this motion (Doc. 52-20, PageID.500-01).

**H.     August 8, 2022, Summary Judgment on Clay's False Imprisonment/Malicious Prosecution Action Against Becky and David for May 27, 2020, Arrest**

14

26.     On January 24, 2020, Clay filed a malicious prosecution and false imprisonment action against Becky and David in Baldwin County Circuit Court, Case No. CV-2020-900132, arising out of his arrest for trespass on September 15, 2019 (Doc. 52-23, PaigeID.579-582).  The complaint was amended on September 24, 2020, to add the arrest of May 27, 2020, to the claims. (Doc. 52-24, PageID.584-88).  Becky and David moved for summary judgment, arguing that, as a matter of law, probable cause existed for the arrest for trespass, based upon the lack of any property interest that Clay had in the 10.1 acres where the arrests occurred (Doc. 52-25, PageID.593-596, 598-601 at pp. 4-7, 9-12).  On August 8, 2022, the circuit court granted this motion and dismissed the action (Doc. 52-26, PageID.613).

I.     **August 25, 2022, Order Declaring Commemorative Deed to be Void**

27.     On August 25, 2022, in the 2019 quiet title action, the Baldwin County Circuit Court granted a motion for partial summary judgment filed by Becky, Terry and David on their claim as to the invalidity of the Commemorative Deed (Doc. 52- 27, PageID.615).  They had filed this motion on the grounds that Clay had no authority to act on behalf of the Nolan UCT or the Carol RLT when he executed and recorded that deed, as shown by Becky's Affidavit dated February 9, 2021 (Doc. 52-28, PageID.617).

III.    **Standard of Review**

A party in a lawsuit may move a court to enter summary judgment before trial. Fed. R. Civ. P. 56(a), (b*)*. Summary judgment is appropriate when the moving party establishes there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Greenberg v. BellSouth Telecommunications, Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) ("Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no

genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.' "). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  At the summary judgment juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial." *Id.*at 249. Only disputes about the material facts will preclude the granting of summary judgment. *Id.*

The movant bears the initial burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, (1986). A party must support its assertion that there is no genuine issue of material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ... admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

Once the movant meets its burden under Fed. R. Civ. P. 56, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "A genuine issue of material fact exists when 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1232 (11th Cir. 2011) (quoting *Anderson*, 477 U.S. at 248).  The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Id.* (citing *Rosario v. Am. Corrective Counseling Servs., Inc.*, 506 F.3d 1039, 1043 (11th Cir. 2007)).  However, to avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586 (citations omitted).  "Speculation does not create a

*genuine* issue of fact." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (emphasis in original) (citation omitted). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *See Anderson*, 477 U.S. at 249-50 (citations omitted). In short, summary judgment is proper after adequate time for discovery and upon motion against a party who fails to make a showing that is sufficient to establish the existence of an element that is essential to that party's case. *Celotex*, 477 U.S. at 322.

## IV.   Conclusions of Law

### A.   Principles of Liability Under Section 1983

To sustain a cause of action based on section 1983, a plaintiff must establish he suffered a deprivation of rights, privileges or immunities secured by the Constitution or laws of the United States by a person acting under color of law. *Wideman v. Shallowford Cmty. Hosp., Inc.*, 826 F.2d 1030, 1032 (11th Cir. 1987). Even where a constitutional violation is shown, a public official has qualified immunity for conduct within his or her discretionary authority and that is not shown to have been unlawful under clearly established law.

### 1.   An arrest does not violate the Fourth Amendment where probable cause exists to believe some crime has been committed

The Fourth Amendment protects citizens "against unreasonable searches and seizures" by police officers. *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 734 n. 15 (11th Cir. 2010). An arrest is a "seizure" under the Fourth Amendment. *Case v. Eslinger*, 555 F.3d 1317, 1326 (11th Cir. 2009). "The 'reasonableness' of a seizure or arrest under the Fourth Amendment turns on the presence or absence of probable cause." *Id.*   "In order to make an arrest without a warrant, a police officer must have probable cause to believe that the suspect committed a crime." *Huebner v. Bradshaw*, 935 F.3d 1183, 1187 (11th Cir. 2019).   Probable cause "is not a high bar." *Paez v. Mulvey*, 915 F.3d 1276, 1286 (11th Cir. 2019) (quoting *Dist. Of Columbia v. Wesby*, 199 L. Ed.

2d 453, 138 S. Ct. 577, 586 (2018)).   In the wake of the Supreme Court's *Wesby* decision, "the correct legal standard to apply in evaluating whether an officer had probable cause to seize a suspect is to 'ask whether a reasonable officer could conclude . . . that there was a substantial chance of criminal activity.'" *Washington v. Howard*, 25 F.4th 891, 902 (11th Cir. 2022) (quoting *Wesby,* 138 S. Ct. at 588).[4]

Probable cause is a "flexible and fluid" concept, that looks to "the totality of the circumstances to determine the reasonableness of the officer's belief that a crime has been committed." *Paez*, 915 F.3d at 1286.   "[A]rresting officers, in deciding whether probable cause exists, are not required to sift through conflicting evidence or resolve issues of credibility, so long as the totality of the circumstances present a sufficient basis for believing that an offense has been committed." *Id.* (quoting *Dahl v. Holley,* 312 F.3d 1228, 1234 (11th Cir. 2002)). "This is so, in part, because probable cause is a preliminary determination made initially in an ex parte proceeding." *Id.*   "[I]t does not require anything close to conclusive proof or proof beyond a reasonable doubt that a crime was in fact committed, or even a finding made by a preponderance of the evidence." *Id.*  (citing *Manners v. Cannella*, 891 F.3d 959, 968 (11ᵗʰ Cir. 2018)).

"[A]n affirmative defense to an alleged crime does not necessarily vitiate probable cause." *Paez*, 915 F.3d at 1286 (citing *Manners*, 891 F.3d at 971–72). "[P]olice officers aren't lawyers;

---

[4] In *Washington v. Howard,* the Eleventh Circuit reviewed all of its post-*Wesby* decisions that had applied or articulated an older standard that predated *Wesby* and which was "more demanding" than the *Wesby* standard.  25 F.4th at 899.  The older standard required "facts and circumstances such that all prudent people would affirmatively believe that the suspect has already engaged in or will shortly engage in criminal behavior." *Id.*  The *Wesby* standard "requires only that it be reasonable for any particular officer to conclude that there is a substantial chance of criminal activity." *Id.*  After reviewing conflicts in its precedents and finding that, in every decision, faithful application of the *Wesby* standard would have led to the same conclusion that there was no probable cause, the court concluded it was not bound to apply the older standard.  *Id.* at 899-901.  Thus, it concluded the correct legal standard was that announced by the Supreme Court in *Wesby*. *Id.* at 902.

we do not expect them to resolve legal questions or to weigh the viability of most affirmative defenses." *Paez*, 915 F.3d at 1286(citing *Williams v. City of Albany*, 936 F.2d 1256, 1260 (11th Cir. 1991)); *see Hutton v. Strickland*, 919 F.2d 1531, 1541 (11th Cir. 1990) ("In making probable cause decisions, law enforcement officers are not charged with knowing legal technicalities and nuances, but with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians act.") (quoting *Brinegar v. United States,* 338 U.S. 160, 175 (1949)).  "So long as it is reasonable to conclude from the body of evidence as a whole that a crime was committed, the presence of some conflicting evidence or a possible defense will not vitiate a finding of probable cause.  The touchstone remains the reasonableness of the officer's conduct." *Paez*, 915 F.3d at 1286.

"Generally, an officer is entitled to rely on a victim's criminal complaint as support for probable cause." *Myers v. Bowman*, 713 F.3d 1319, 1326–1327 (11th Cir. 2013) (quoting *Rankin v. Evans*, 133 F.3d 1425, 1441 (11th Cir. 1998)).  "A law enforcement officer is under no obligation to believe a suspect's story and forego an arrest when the information she initially received provided probable cause to believe that the suspect had committed or was committing a crime." *Watkins v. Broward Sheriff Off.*, 824 F. App'x 865, 869 (11th Cir. 2020) (citing *Marx v. Gumbinner*, 905 F.2d 1503, 1507 n.6 (11th Cir. 1990)).  "[W]hat counts for qualified immunity purposes relating to probable cause to arrest is the information known to the defendant officers . . . at the time of their conduct, not the facts known to the plaintiff then or those known to a court later." *Jones v. Cannon*, 174 F.3d 1271, 1283 n.4 (11th Cir. 1999).

"Probable cause for an arrest may be found if there is probable cause to believe *any* crime was committed, whether or not there is probable cause for the crime the arresting officer actually believed had been committed." *Manners,* 891 F. 3d at 969 (emphasis added) (holding that officers

had probable cause to arrest plaintiff for fleeing police officers even though no probable cause existed for believing a crime had been committed, a belief that led to their efforts to arrest plaintiff).

### 2.   Principles of qualified immunity

"Qualified immunity shields public officials from liability for civil damages when their conduct does not violate a constitutional right that was clearly established at the time of the challenged action." *Echols v. Lawton*, 913 F.3d 1313, 1319 (11th Cir. 2019) (internal quotation marks omitted).   "The purpose of the doctrine is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation." *Anderson v. Creighton,* 483 U.S. 635, 638 (1987); *Lee v. Ferraro*, 284 F.3d 1188, 1193–94 (11th Cir. 2002). The doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *Hope v. Pelzer,* 536 U.S. 730, 752 (2002) (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)).

To receive qualified immunity, the officer "bears the initial burden to prove that he acted within his discretionary authority." *Dukes v. Deaton*, 852 F.3d 1035, 1041 (11th Cir. 2017).   In resolving this issue, the court considers whether the officer was "(a) performing a legitimate job-related function (that is pursuing a job-related goal), (b) through means that were within his power to utilize." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004).

 If the defendant officer establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate. *Huebner*, 935 F.3d at 1187.  In evaluating whether a plaintiff has met this burden, the court examines: (1) whether the facts, taken in the light most favorable to the party asserting the injury, show that the defendant's conduct violated a constitutional right, and (2) whether the right in question was "clearly established" at the time of the alleged violation. *Id.*

### 3.   Qualified immunity for an arrest based on arguable probable cause

An officer is not automatically liable for making an arrest that, when seen with the benefit of hindsight, turns out not to have been supported by probable cause.  *Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1137 (11th Cir. 2007).  "[I]t is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials . . . should not be held personally liable." *Id.* (quoting *Anderson*, 483 U.S. at 641).  For these reasons, even if the court determines an officer did not in fact have probable cause, if he had "arguable probable cause" to make the arrest, that is all that is required for qualified immunity. *Id.* (quoting *Scarbrough v. Myles*, 245 F.3d 1299, 1302 (11th Cir. 2001)).  "Arguable probable cause" exists where "reasonable officers in the same circumstances and possessing the same knowledge as the Defendant [] *could have believed* that probable cause existed to arrest." *Id.* (emphasis in original) (quoting *Lee*, 284 F.3d at 1195). This standard "allows for the possibility that an officer might reasonably but mistakenly conclude that probable cause is present." *Gates v. Khokhar*, 884 F.3d 1290, 1298 (11th Cir. 2018).

"In determining whether arguable probable cause exists, '[w]e apply an objective standard, asking whether the officer's actions are objectively reasonable . . . regardless of the officer's underlying intent or motivation.'"  *Lee*, 284 F.3d at 1195 (some internal quotation marks omitted) (quoting *Vaughan v. Cox,* 264 F.3d 1027, 1036 (11th Cir. 2001). "Arguable probable cause does not require an arresting officer to prove every element of a crime . . . before making an arrest, which would negate the concept of probable cause and transform arresting officers into prosecutors." *Id.* (quoting *Scarbrough*, 245 F.3d at 1302–03).

### 4. Qualified immunity for alleged conduct that is not unlawful under "clearly established law"

Even where an issue of fact exists as to whether arresting officers had "arguable probable cause" for the arrest, qualified immunity may still be established if the plaintiff fails to show that

the alleged conduct of the officer violated "clearly established law" under the facts of the case. *See Henley v. Millsap*, No. 21-12231, 2022 WL 3654846 (11th Cir. Aug. 25, 2022). "Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Helm v. Rainbow City, Alabama*, 989 F.3d 1265, 1272 (11th Cir. 2021) (quoting *Wesby*, 138 S. Ct. at 589) (internal quotations omitted).   The Supreme Court has "repeatedly stressed that courts must not 'define clearly established law at a high level of generality, . . ..'" *Wesby*, 138 S. Ct. at 590 (quoting *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014)).   Rather, the right in question must be defined at a level that is "'particularized' to the facts of the case." *White v. Pauly*, 580 U.S. 73, 137 S. Ct. 548, 552 (2017).  The Court has also "stressed that the specificity of the rule is especially important in the Fourth Amendment context." *Glasscox v. Argo, City of*, 903 F.3d 1207, 1218 (11th Cir. 2018) (quoting *Wesby*, 138 S. Ct. at 590).   Given the "imprecise nature" of what constitutes probable cause, "officers will often find it difficult to know how the general standard of probable cause applies in 'the precise situation encountered.'" *Wesby*, 138 S. Ct. at 590 (quoting *Ziglar v. Abbasi,* 137 S. Ct. 1843, 1866 (2017)).   Thus, the Court has "stressed the need to 'identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment.'" *Id.* (quoting *White*, 137 S. Ct. at 552).   "While there does not have to be a 'case directly on point,' existing precedent must place the lawfulness of the particular arrest 'beyond debate.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).   Aside from an "obvious case" where the unlawfulness of the officer's conduct is "sufficiently clear" even though existing precedent does not address similar circumstances, [5]  "a body of relevant case law is usually

---

[5] The Eleventh Circuit has recognized that *Wesby* and other Supreme Court precedents emphasize that the "clearly established law" standard is a "demanding" one and that the "obvious clarity"

necessary to clearly establish the answer with respect to probable cause." *Id.* (internal quotation marks omitted).

Only decisions from the United States Supreme Court, the Eleventh Circuit, or the relevant state's supreme court are relevant in determining whether the law was clearly established. *Bradley v. Benton,* F.4th 1232, 1242-43 (11th Cir. 2021)).

### B.   Eleventh Circuit Case Law on Qualified Immunity for Arrest for Trespass

The Eleventh Circuit has held that officers making an arrest for trespass had qualified immunity even in the face of legal documentation showing the arrestee had colorable title to the land.  In *Hutton v. Strickland,* 919 F.2d 1531 (11th Cir. 1990), the plaintiffs, the Huttons, sought to repossess ranch property they had earlier conveyed to the Laws under a land sale contract, after a default by the Laws under the contract, which entitled the Huttons to record a quitclaim deed conveying the property back to themselves from the Laws.  *Id.* at 1533-35.  The Sheriff informed the Huttons that his department could not arrest them in repossessing the land.  *Id.* at 1534.  Upon inquiry, an assistant state attorney advised the investigating officer and the Sheriff that the Huttons' quitclaim deed gave them a colorable claim of title.  *Id.*  In possession of the quitclaim deed, the Huttons thereafter attempted to retake the ranch by self-help, cutting the chain lock on the front gate and driving past a "no trespassing" sign on the way to the house.  *Id.*  Encountering Ms. Law, the Huttons told her to vacate the property; she asked the Huttons to leave.  When they refused, she summoned the Sheriff's department.  Upon arrival, the officer in charge spoke with the Huttons and Ms. Law and radioed the Sheriff, who instructed the officer to arrest the Huttons for trespass.

---

exception must be kept "narrow." *Cantu v. City of Dothan, Alabama*, 974 F.3d 1217 (11th Cir. 2020).

*Id.* After being arrested and subsequently released, they sued the Sheriff under § 1983 for false arrest. *Id.* at 1434-35.

In opposition to the Sheriff's motion for summary judgment based on qualified immunity, the plaintiffs argued that they lacked the willful intent to commit an unlawful act, because of the Laws' default on the land sale contract, and that, because they possessed a recorded quitclaim deed, Ms. Law was not occupying the property lawfully.  *Id.* at 1540.  The district court denied the Sheriff's motion, but the Eleventh Circuit reversed.  The apparent evidence of the Huttons' trespass upon the officers' arrival — the cut lock on the gate and a pair of bolt cutters and a rifle in the bed of the Huttons' truck, together with the Sheriff's instruction to arrest the Huttons, *id.* at 1534 — was sufficient to show that the arresting officers, acting at the Sheriff's direction, did not violate clearly established law.  Thus, the Sheriff had qualified immunity.  *Id.* at 1542.  The Huttons' beliefs concerning the legality of their entry onto the ranch property were "irrelevant" to qualified immunity analysis, which "examines the conduct of the subject government officials only."  *Id.* at 1540.  Although the ownership of the ranch was a disputed issue when the plaintiffs were arrested, the Eleventh Circuit refused to hold the Sheriff or the officers "to knowledge of property law in determining probable cause."  *Id.* at 1542.  The court relied upon a Fifth Circuit decision that refused to require officers to ascertain the location of a property line "from official sources," for them to have a reasonable belief that the plaintiff was trespassing.  *Id.* (citing *Bodzin v. City of Dallas*, 768 F.2d 722 (5th Cir. 1985)).

The Eleventh Circuit has also held that arresting officers were entitled to qualified immunity even though the arrested plaintiff was not a trespasser, and he truthfully told the officers that his neighborhood owned the trail on which he was walking.  In *Elliott v. Wilcox*, 641 F. App'x 893 (11th Cir. 2016), the plaintiff was walking his dog along a grassy trail owned by his

subdivision on which a power company had an easement to run power lines. *Id.* at 894. A Florida Wildlife Commission officer encountered the plaintiff while patrolling the trail, having received information from the power company about trespassers in the area. He had seen a "no trespassing" sign as he entered the trail. The officer believed that the power company owned the trail and that the plaintiff did not have permission to be there. *Id.* When the officer stated he was patrolling for the power company and claimed the plaintiff was trespassing on its land, the plaintiff denied this and told the officer that the subdivision owned the land and had put up the "no trespassing" signs. *Id.* After his subsequent arrest for trespass, he sued the officer and others assisting in that arrest.

The Eleventh Circuit upheld summary judgment for the defendants on the § 1983 claim for false arrest. *Elliott*, 641 F. App'x at 896–897. The court held that the officer had arguable probable cause to arrest the plaintiff for trespass, given his viewing the "no trespassing" sign at the entrance to the trail. Whatever the plaintiff knew regarding who owned the land and whatever he told the officer about his right to be on the trail was "irrelevant" because the officer believed the power company owned the land and that the plaintiff was not allowed to walk on the trail. *Id.* at 897. It cited *Hutton* for the proposition that "we do not hold arresting officers to knowledge of property law in determining probable cause" *Id.* (quoting *Hutton*, 919 F.2d at 1542). Under the "fellow officer" rule,[6] the other officers assisting in the arrest also had arguable probable cause for the arrest because they could rely on information the one officer gave them about his encounter with

---

[6] Under the "fellow officer" rule, courts impute "the collective knowledge of the investigating officers to . . . each participating officer." *Terrell v. Smith*, 668 F.3d 1244, 1252 (11th Cir. 2012) (citing *United States v. Hensley,* 469 U.S. 221, 232 (1985)). The court may look to the collective knowledge of the law enforcement officials' involvement in an investigation "if they maintained at least a minimal level of communication during their investigation." *United States v. Andres*, 960 F.3d 1310, 1317 (11th Cir. 2020) (quoting *United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985)).

the plaintiff.  *Id.;  see also Terry v. Smith*, No. CIV.A. 09-0722-CG-N, 2012 WL 3206408, at \*10 (S.D. Ala. Aug. 6, 2012) (Granade, J.) (officers had arguable probable cause to arrest plaintiffs for remaining on public road after warning to leave, "[e]ven if the officers were wrong in their understanding that the [road] belonged to the County," which had filed a resolution vacating the road and reverting title to the plaintiffs, contingent upon certain terms and conditions that had not yet been met).

    **C.**    **For Qualified Immunity Purposes, the Defendant Officers Acted Within Their Discretionary Authority in Arresting Clay in Baldwin County.**

Ala. Code § 15-10-1 provides:

> "An arrest may be made, under a warrant, or without a warrant, by any sheriff or other officer acting as sheriff or his deputy, or by any constable, acting within their respective counties, or by any marshal, deputy marshal or *policeman of any incorporated city or town within the limits of the county*." (emphasis added).

Pursuant to this statute, municipal law enforcement officials have the lawful authority to make an arrest anywhere within the county in which the municipality lies.  Numerous Alabama cases have upheld the lawfulness of arrests occurring outside the police jurisdiction of the municipality employing the officer but within the county in which the municipality was located. *See Ex parte Pettway*, 594 So. 2d 1196, 1201 n.5 (Ala. 1991); *Brooks v. State*, 471 So. 2d 511, 515 (Ala. Crim. App. 1985); *Hutto v. State*, 53 Ala. App. 685, 689–690, 304 So. 2d 29 (Ala. Crim. App. 1974); *Reed v. State*, 48 Ala. App. 120, 122, 262 So. 2d 321 (Ala. Crim. App. 1972).  Thus, police officers making an arrest within the county, but outside the city police jurisdiction, are acting within the scope of their discretionary authority.  *Scott v. Palmer*, 210 F. Supp. 3d 1303, 1310 (N.D. Ala. 2016), *aff'd sub nom. Scott v. City of Red Bay, Alabama*, 686 F. App'x 631 (11th Cir. 2017).

Despite the dismissal of the criminal trespass charge against Clay Cooper arising out of the May 27, 2020 arrest, based on the City's prosecutor's motion to *nolle prosse* the cases without prejudice, the police officers of the Town of Loxley had lawful authority to make that arrest because it was within Baldwin County, which encompassed Loxley.   Whether or not Clay was correct that the municipal court lacked jurisdiction, the Defendant officers were acting within the scope of their discretionary authority in making that arrest.

**D.      The Defendant Officers Have Qualified Immunity for the Arrest of Clay on May 27, 2020, for Criminal Trespass and for Fleeing Arrest.**

### *1.    Criminal trespass*

Ala. Code § 13A-7-3 (1975) states

> "A person is guilty of criminal trespass in the second degree if he knowingly enters or remains unlawfully in a building or upon real property which is fenced or enclosed in a manner designed to exclude intruders."

"A person 'enters or remains unlawfully' in or upon premises when he is not licensed, invited or privileged to do so." Ala. Code § 13A-7-1(3).

On May 27, 2020, the arresting officers, Defendants Kuiken, Glass and Lister, had probable cause to arrest Clay for criminal trespass because a reasonable officer, armed with the collective knowledge they had, could conclude that there was a "substantial chance" that Clay was trespassing on property owned by David and Becky Bonner. *Wesby*, 138 S. Ct. at 588.  During his investigation, Officer Kuiken had been given documentation showing that the Bonners had record title to the property, and a letter from their lawyer, outlining the successive judicial rejections of Clay's claim that he had an ownership interest in the property, culminating in a published opinion of the Alabama Supreme Court.  That letter informed the Loxley Police Department that Clay had no permission to be on the property.    And Kuiken had Officer Hattemar's notes on the Incident/Offense Report that Terry had reported that Clay had tampered with the property and

27

intimidated his siblings.  On the day of the arrest, David had called the Loxley Police Department and reported that Clay was trespassing and, upon the officers' arrival, again reiterated Clay's trespass and his desire to remove Clay from the property.  Even after warning Clay that he had been told to leave the property, Clay refused and continued to plow with his tractor.  The arresting officers were not charged with "resolving legal questions" or "weigh[ing] the viability" of Clay's defenses to the claim of trespass.  *See Paez*, 915 F.3d at 1286.  They did not need to resolve the merits of Clay's theory that he owned a one-third interest in the land.

In any event, Kuiken knew that Clay's claim to a one-third interest had been rejected by the Baldwin County Circuit Court and the Alabama Supreme Court.  Simply because he continued to litigate his claim of ownership, after such claims had been previously adjudicated against him, to a final judgment, did not negate probable cause to believe he was trespassing.  Indeed, the Baldwin County Circuit Court itself, in granting summary judgment to Becky and David in Clay's malicious prosecution action, has concluded that they had probable cause to have Clay prosecuted for trespass on their property, as a matter of law.  Because the Defendant officers had probable cause for Clay's arrest on May 27, 2020, no constitutional violation occurred.

At a minimum, even if there were an absence of probable cause, reasonable officers in the same circumstances and possessing the same collective knowledge as the Defendant officers, "*could* have believed" that probable cause existed to arrest.  Thus, arguable probable cause for the arrests exists and the Defendant officers are entitled to qualified immunity.

Finally, Clay has not shown that, at the time of Clay's arrest on May 27, 2020, the law in this circuit was so "clearly established" that every reasonable officer would have understood that the attempt to arrest Clay at the time was unlawful.  To the contrary, the published decisions in

this circuit demonstrate the opposite:  Far less substantial and more conflicting evidence of trespassory conduct has been held sufficient to establish probable cause for an arrest.

The Court rejects Clay's argument that the Defendant officers' knowledge of the existence of the pending quiet title action between Clay and his siblings negates probable cause for the arrest or otherwise disempowered the officers from making that arrest.  Clay has cited no case law or authority of any kind that adopts such a principle.  Indeed, such a rule of deference to any pending civil action over title would cripple law enforcement officials in their efforts to prevent breaches of the peace and to ensure the safety of the citizens they are called to protect.  The pendency of the civil litigation in the present case is particularly inconsequential to the existence of probable cause for the arrest because it was instigated by Clay's siblings to clear the cloud on their title caused by Clay's unilateral action in filing the Commemorative Deed, reasserting a claimed interest in the property that has previously been rejected by the courts.

### 2.   *Fleeing arrest.*

Even if neither probable cause nor arguable probable cause existed for an arrest of Clay for criminal trespass, if there were probable cause or arguable probable cause to believe *any* crime had been committed, the Defendant officers can have no liability for arresting Clay.  *See Manners*, 891 F.3d at 969.  In this case, such probable cause and, at a minimum, arguable probable cause existed for a belief that Clay had committed a crime by intentionally fleeing from the Defendant officers, knowing they were attempting to arrest him.  Ala. Code § 13A-10-52(a) makes it "unlawful for a person to intentionally flee by any means from anyone the person knows to be a law enforcement officer if the person knows the officer is attempting to arrest the person."  The bodycam video clearly shows Clay's defiance of the officers' attempts to get him off the land, telling them they were not going to arrest him and that they should call the Baldwin County

Sheriff's Office if they wanted to do so.  He then is seen fleeing on the tractor as the officers pursue him.  The Defendant officers had probable cause or, at a minimum, arguable probable cause to arrest Clay for violation of § 13A-10-52(a) and thus qualified immunity for that arrest.

Clay claims that he "had no knowledge that the officers intended to arrest him until after they had chased him across the field," (Doc. 59, PageID.710).  The relevant issue is what a reasonable officer could have believed, faced with the same circumstances.  "[N]o police officer can truly know another person's subjective intent."  *Jordan v. Mosley*, 487 F.3d 1350, 1355 (11th Cir. 2007) (holding that arresting officer needed no specific evidence of suspect's intent before determining that probable cause existed to support an arrest).  "Instead, intent is most often inferred from the person's actions in a particular context."  *Stefani v. City of Grovetown*, 780 F. App'x 842, 849 (11th Cir. 2019) (citing *Jordan, supra*).  Based upon review of Clay's actions and words on the bodycam video, a reasonable officer could have believed that Clay was fleeing the Defendant officers' attempts to arrest him, providing, at a minimum, arguable probable cause for his arrest for violation of §13A-10-52(a).

Clay cites Ala. Code § 13A-10-53 as giving him an affirmative defense to prosecution under § 13A-10-52, where the arrest is "unlawful."  Even if the arrest for criminal trespass were unlawful, the affirmative defense asserted by Clay does not vitiate probable cause or arguable probable cause for the arrest for violation of § 13A-10-52.  The Eleventh Circuit has "repeatedly held that the existence of facts that give rise to an affirmative defense does not defeat probable cause, actual or *arguable*."  *Rickerson v. Jeter*, No. 21-12563, 2022 WL 2136017, at *3 (11th Cir. June 14, 2022) (emphasis in original) (citing *Jordan*, 487 F.3d at 1356–57, *Morris v. Town of Lexington Alabama*, 748 F.3d 1316, 1325 (11th Cir. 2014), *Manners v. Cannella,* 891 F. 3 959, 971-72 (11th Cir. 2018), and *Paez*, 915 F.3d at 1286).

E.   **The Defendant Officers Have no Liability on Plaintiff's Claim of Violation of His Fourth Amendment Rights Based on Alleged Malicious Prosecution for the Theft of Hay.**

To prove a violation of one's Fourth Amendment right to be free of unreasonable seizures by an allegedly malicious prosecution, the plaintiff must prove not only a seizure in violation of that constitutional right but also the elements of the common law tort of malicious prosecution. *Williams v. Aguirre*, 965 F.3d 1147, 1157 (11th Cir. 2020) (citing *Paez*, 915 F.3d at 1285). Under the common law elements of malicious prosecution, Clay must prove that one or more of the Defendant officers "instituted or continued" a criminal prosecution against him, "with malice and without probable cause," that terminated in his favor and caused damage to him. *Id.* (quoting *Paez*, 915 F.3d at 1285). These elements "ultimately are controlled by federal law." *Id.* (quoting *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1256 (11th Cir. 2010)). If the conduct alleged does not violate the Fourth Amendment, the officers are entitled to qualified immunity. *Paez*, 915 F.3d at 1285.

None of the Defendant Officers was involved in the arrest of Clay on May 24, 2021, for theft of the hay bales. Clay was arrested on that date by a Baldwin County Sheriff's Deputy. That arrest followed a grand jury indictment obtained by the DA's office. The only Defendant implicated by Clay's allegations for this arrest is Officer Kuiken for allegedly providing "inaccurate or incomplete information" to the grand jury. (Second Amd. Comp., ¶29 (Doc. 36, PageID.115)).

These allegations are insufficient to even state a plausible claim for § 1983 malicious prosecution where the arrest and prosecution occurred because of a grand jury indictment. However "incomplete" or "inaccurate" the information supplied by Kuiken to the DA,[7] the

---

[7] The only "inaccurate" information identified by Clay in his brief is Kuiken's May 5, 2020 note to the I/O Report that "our department was notified that the civil litigation of property between

that the indictment had been obtained as the result of deception or undue pressure practiced by him. In any event, Plaintiff has not provided any evidence that the indictment was obtained because of any such deception or undue pressure by Officer Kuiken.

Further, given Kuiken's investigation, he had probable cause to believe that Clay had stolen the hay. Whether or not Clay knew that Hayes had an interest in those hay bales, based on his investigation, Officer Kuiken had probable cause for believing that Clay took those hay bales from property he had no right or privilege to enter. The existence of probable cause negates any claim for malicious prosecution.

Finally, because Clay agreed to restitution, in exchange for the *nolle prossing* of the criminal charges, he is now precluded from contesting the existence of probable cause and prosecution. This is the common law rule in Alabama, s*ee Chatman v. Pizitz, Inc.*, 429 So. 2d 969, 971–972 (Ala. 1983), and throughout the nation. *See Leonard v. George*, 178 F.2d 312, 314 (4th Cir. 1949) (the rule that termination of a criminal case brought about by a compromise or settlement is an admission of probable cause and precludes a suit for malicious prosecution "is established by the overwhelming weight of authority") (citing authorities); *Lloyd v. Almeda State Bank*, 346 S.W.2d 947, 952 (Tex. Civ. App. 1961), *writ refused NRE* (Oct. 3, 1961)("The compromise of this criminal complaint is a bar to [plaintiff's] right to recover [for malicious prosecution] and this is not only the rule in Texas, but we think it applies throughout the nation.") (citing authorities); 54 C.J.S. Malicious Prosecution § 52 ("The compromise and settlement, by the accused, of the criminal charge constitutes an admission of probable cause for the prosecution"); *see generally* 26 A.L.R.4th 565 (Originally published in 1983) § 2[a] ("As a general rule, the termination of a criminal prosecution by a compromise or settlement of the accused's civil liability is not regarded by the courts as a favorable termination for the purposes of a

subsequent malicious prosecution action," the reason being "that a compromise or settlement is such an admission of probable cause as to estop the accused from afterward retracting the implied admission and trying the issue by which settlement he waived").

This rule was well recognized under the common law as of 1871, when § 1983 was enacted.[8]  *See Craig v. Ginn*, 19 Del. 117, 48 A. 192, 194 (1901) (citing pre-1871 case law, court notes that "the rule seems to have been settled that, where the termination of the prosecution has been brought about by the procurement of the party prosecuted, or by a compromise and agreement of the parties, that an action for malicious prosecution cannot be maintained");  *Emery v. Ginnan*, 24 Ill. App. 65, 70 (Ill. App. Ct. 1887) (citing pre-1871 law, court recognizes that it is "substantially the view taken in every case we have been able to find" that where case is dismissed by settlement or compromise procured by party prosecuted, a malicious prosecution suit may not thereafter be maintained);  s*ee, e.g., Marks v. Gray*, 42 Me. 86 (1856); *Clark v. Everett*, 2 Grant 416, 1854 WL 6133 (Pa. 1854); *McCormick v. Sisson*, 7 Cow. 715, 1827 WL 2482 (N.Y. Sup.Ct. 1827); *Parker v. Farley,* 64 Mass. (1 Cush.) 279 (1852).  Indeed, in its lengthy, historical analysis of the tort of malicious prosecution under the common law as of 1871, the Eleventh Circuit discussed this rule in *Laskar v. Hurd*, 972 F. 3d 1278 (11ᵗʰ Cir. 2020), noting that terminations because of "settlements in which the defendant admitted guilt" were "fatal to a plaintiff's ability to establish the absence of probable cause."  *Id.* at 1288-1289 (citing *Morton v. Young*, 55 Me. 24, 27 (1867) as "holding

---

[8] In *Thompson v. Clark*, 142 S. Ct. 1332 (2022), the Supreme Court specified that it is the Court's practice to look at the elements of the most analogous tort as of 1871 when § 1983 was enacted "so long as doing so is consistent with the 'values and purposes of the constitutional right at issue.'"  *Id.* at 1337.

that a plaintiff who settled a prosecution by paying part of the amount his accuser demanded was estopped from contesting the absence of probable cause").[9]

Plaintiff "urges" this Court to recognize "actual innocence" as a limited exception to this common law rule (Doc. 59, PageID.713).  But he cites no legal authority to support such an exception.  It has, in fact, been rejected in other jurisdictions.  *See Leonard v. George,* 178 F. 2d 312, 313 (4th Cir. 1949), *cert. denied*, 339 U.S. 965 (1950) ("Notwithstanding the protests and declarations of plaintiff [of his innocence of the crime charged] made at the time, we think that he is unquestionably precluded by the settlement for suing for malicious prosecution with respect to the case thus disposed of.").  In any event, there is no evidence in the record that, at the time of the dismissal of the criminal case, Clay agreed to restitution under protest or declared his innocence. So, even if there were an exception to the rule, where a compromise or settlement is reached under a declaration of protest of innocence, that exception would have no application in the present case.

**F.     The Town of Loxley Has No Liability**

Because the evidence is insufficient to show a constitutional violation arising out of Clay's arrests in May of 2020 and May of 2021, the Town of Loxley can face no liability in this case.  *See Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir. 1996) (noting that when there is no constitutional violation, the court has no occasion to consider the liability of the county); *Vineyard v. Cnty. of Murray, Ga.*, 990 F.2d 1207, 1211 (11th Cir. 1993) ("Only when it is clear that a

---

[9] In addition to recognizing that such compromises estopped plaintiffs from arguing a lack of probable cause, the court in *Laskar* also concluded that, under pre-1871 common law, a final termination "inconsistent with a [malicious prosecution] plaintiff's innocence" included one brought about by a "compromise[] with his accuser to end the prosecution in a way that conceded his guilt." *Id*. at 1289. Here, where the restitution was agreed to be paid without any evidence that this was done under protest or accompanied by declaration of innocence, the compromise operated as an implied admission of guilt and would not appear to be a favorable termination under this Eleventh Circuit precedent.

violation of specific rights has occurred can the question of § 1983 municipal liability for the injury arise.").

Even if there were evidence of a constitutional violation, Clay's claims against the Town of Loxley fail because he has not shown that any "policy" or "custom" of the Town of Loxley was the "moving force" behind any alleged constitutional violation, as required under the case law. *See Canton v. Harris*, 489 U.S. 378, 389 (1989) (quoting *Monell v. City of New York Dept. of Social Serv.,* 436 U.S. 658, 694 (1978)).   Clay has not provided evidence of the "limited circumstances" in which the allegation of a failure to train or supervise can be basis for liability under § 1983.  *See City of Canton, Ohio v. Harris,* 489 U.S. 378, 387 (1989).   Only when the failure to train amounts to "deliberate indifference" can it properly be characterized as a "policy" or "custom" necessary for § 1983 liability to attach.  *Id.* at 389.  Plaintiff has shown no evidence of such deliberate indifference.

In apparent recognition of the insufficiency of such evidence in support of his allegations, Clay abandons this theory of liability in his brief and seeks instead to ground his claims against the Town based on alleged actions taken by Chief Cason as the "primary policy maker" for the Loxley Police Department and describes an "official policy or custom of the Town of Loxley to ignore all exculpatory evidence regarding Clay's ownership in the farm" and a "deliberate indifference by the Town for its police misconduct." (Doc. 59, PageID.715-717).  Such a claim has not been alleged in the complaint and the Plaintiff cannot now unilaterally amend his complaint through a brief opposing summary judgment.  *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314 (11th Cir. 2004).  In any event, Clay has submitted no evidence in support of this new theory.  Chief Cason has testified in this action that he was not aware of any similar situations involving Loxley Police officers comparable to the situation involving Clay Cooper (Doc. 52,

PageID.631).  Plaintiff has provided no evidence to contradict this testimony.  He shows no history of widespread abuse or problems in similar situations that could be interpreted as a policy or custom of the Town regarding determinations about probable cause in similar situations.  He has failed to establish any practice or custom so pervasive as to be the equivalent of a policy adopted by the final policy maker.  Whatever merits Clay's arguments have as to the Defendant Officers ignoring exculpatory evidence in the investigation leading up to Clay's arrest (and that argument is not supported by the evidence), what happened in Clay Cooper's case is not sufficient to demonstrate a policy or custom that would impose independent liability on the Town for the arrest of Clay.

## <u>Conclusion</u>

For all the above foregoing reasons, the Court finds that there are no genuine issues of material fact and that the Defendants are entitled to entry of judgment as a matter of law.  As such, the Defendants' motion for summary judgment is granted as to all claims and the action is dismissed with prejudice in its entirety.  A separate judgment will enter.

DONE and ORDERED this 13th day of January, 2023.

s/WILLIAM E. CASSADY
UNITED STATES MAGISTRATE JUDGE